Mark Holscher (SBN 139582)
mark.holscher@kirkland.com
David I. Horowitz (SBN 248414)
david.horowitz@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Attorneys for Defendant
Raytheon Company

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION — LOS ANGELES**

| | |
|---|---|
| NORTHROP GRUMMAN OVERSEAS SERVICE CORPORATION, a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>RAYTHEON COMPANY, a Delaware Corporation, and DOES 1 through 10,<br><br>Defendants. | CV10-4663- SJO(MANx)<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND FOR LACK OF SUBJECT MATTER JURISDICTION**<br><br>Assigned: Hon. S. James Otero<br>Court Room: 1, Second Floor<br>Hearing date: August 9, 2010<br>Hearing time: 10:00 a.m. |

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................1

II. BACKGROUND ..................................................................................................2

    A. Raytheon Enters Into A Prime Contract With The Hellenic Ministry Of National Defense To Retrofit F-16 Aircraft Sold To Greece By The United States Under A Foreign Military Sales Program. .....................................................................................................2

    B. Raytheon Enters Into A Subcontract With Northrop To Provide RWR Components For The F-16 Fleet The Hellenic Ministry of National Defense Purchased Under The Peace Xenia III FMS Program. .....................................................................................................3

    C. Raytheon Enters Into A Prime Contract With The United States Government To Provide Electronic Warfare Suites For A New F-16 Fleet For Greece, And Thereafter Subcontracts With Northrop. ......................................................................................................4

    D. Northrop's Delays Prevent Raytheon From Reaching AFT And Rather Than Work Cooperatively With Raytheon, Northrop Seeks To Have Its Performance Obligations "Excused." ..............................6

III. ARGUMENT .......................................................................................................7

    A. Northrop's Remand Motion Should Be Denied Because This Court Has Federal Question Jurisdiction Over Northrop's Claims. ...............7

    B. Northrop's Reliance On Out-of-Circuit Case Law Is Misplaced. ......10

    C. Northrop's Reliance On Raytheon's Complex Case Designation Request Is A Red Herring. ..................................................................11

    D. Northrop's Fee Request Should Be Denied Because Clear Ninth Circuit Authority Provides An Objectively Reasonable Basis For Removal. ...........................................................................................12

IV. CONCLUSION ..................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Pipe & Steel Corp. v. Firestone Tire & Rubber Co.*,
   292 F.2d 640 (9th Cir. 1961) ................................................................. 8, 9, 12, 13

*Balcorta v. Twentieth Century-Fox Film Corp.*,
   208 F.3d 1102 (9th Cir. 2000) ................................................................. 13

*Boyle v. United Techs. Corp.*,
   487 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988) ....................... 7, 8, 9

*Brennan v. Southwest Airlines Co.*,
   134 F.3d 1405 (9th Cir. 1998) ................................................................. 4

*Golden Trade v. Lee Apparel Co.*,
   143 F.R.D. 514 (S.D.N.Y. 1992) ............................................................. 12

*Grinnell Fire Prots. Sys. Co. Inc. v. Regents of the Univ. of Cal.*,
   554 F. Supp. 495 (N.D. Cal. 1982) .......................................................... 9

*Heroth v. Kingdom of Saudi Arabia*,
   565 F. Supp. 2d 59 (D.D.C. 2008) ........................................................... 2, 3

*Martin v. Franklin Capital Corp.*,
   546 U.S. 132 (2005) ................................................................................ 13

*Miller v. Gammie*,
   335 F.3d 889 (9th Cir. 2003) ................................................................... 10

*New SD, Inc. v. Rockwell Int'l Corp.*,
   79 F.3d 953 (9th Cir. 1996) ..................................................................... passim

*Northrop Corp. v. AIL Sys., Inc.*,
   959 F.2d 1424 (7th Cir. 1992) ................................................................. 10

*Woodward Governor Co. v. Curtiss-Wright Flight Sys., Inc.*,
   164 F.3d 123 (2d Cir. 1999) .................................................................... 11

**STATUTES**

22 U.S.C. § 2753(a)(1) ................................................................................. 3

28 U.S.C. § 1447(c) ..................................................................................... 13

**RULES**

Cal. Rules of Court Rule 3.402(b) ............................................................... 11

## I.	INTRODUCTION

This case presents the straightforward issue of whether federal question jurisdiction exists when one military defense contractor sues another to alter the performance of its obligations—especially when that performance bears directly on the ability to complete a related federal Foreign Military Sales contract executed to fulfill an agreement between the federal government and a foreign ally in support of the national security of the United States.  The Ninth Circuit's decision in *New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953, 954–55 (9th Cir. 1996) makes clear that the answer is yes.  *New SD* is the beginning, and the end, of Northrop's remand motion.

In an attempt to distract the Court from binding authority supporting federal question jurisdiction, Northrop's remand motion resorts to recharacterizing the allegations in the Complaint, citing inapposite authority from the Second and Seventh circuits, and presenting red-herring issues about supposed delay.  All of Northrop's arguments fail.  *First*, the face of the Complaint makes clear that Northrop seeks to have its flight-testing obligations "excused."  And even if Northrop merely sought to alter the agreed-upon payment schedule set out in the Raytheon-Northrop subcontract, that too would implicate national security by skewing performance incentives that, in turn, would impede a related contract reached at the behest of the federal government to fulfill governmental commitments made to a foreign ally.  *Second*, this Court sits in the Ninth Circuit; not the Second or the Seventh.  Accordingly, because it is the law, *New SD* controls here.  *Third*, Raytheon has not removed for purposes of delay.  Indeed, this case will likely move more expeditiously in this District than it would in state court.

In the end, there can be no legitimate dispute that Northrop's claims implicate the federal government's national security interests, which the Ninth Circuit has held to support federal question jurisdiction—and thus removal—under *New SD*.  Northrop's motion accordingly should be denied.  Moreover, because removal was

more than "objectively reasonable," the Court should also reject Northrop's request for remand fees.

## II. BACKGROUND

### A. Raytheon Enters Into A Prime Contract With The Hellenic Ministry Of National Defense To Retrofit F-16 Aircraft Sold To Greece By The United States Under A Foreign Military Sales Program.

In April 2003, Raytheon entered into a direct commercial sale ("DCS") Prime Contract with the Hellenic Ministry of National Defense (the "ASPIS II Prime Contract") to provide "Advanced Self-Protection Integrated Suite" electronic warfare equipment for the Greek Air Force's F-16 aircraft fleet. (*See* Compl. ¶ 5.) The program is called "ASPIS II." (*Id.*) The ASPIS II Prime Contract calls for the delivery of 60 complete integrated electronic warfare suites consisting of, among other things, the ALR-93(V) threat warning system ("RWR").

The ASPIS II Prime Contract would not have come to fruition but for the relationship between the United States and Greece, its NATO ally. Indeed, the 60 state-of-the-art complete integrated electronic warfare suites to be delivered under the ASPIS II Prime Contract are designed to retrofit an F-16 fighter jet fleet previously sold to Greece by the United States under a Foreign Military Sales ("FMS") program called Peace Xenia III. (Compl., Ex. A at 29.)

To fully understand the national security implications of Northop's claims, one must understand the basics of FMS programs. "Procurement under [an] FMS Program is governed by the terms and conditions set out in a Letter of Offer and Acceptance between the United States Government and the foreign government." *See Heroth v. Kingdom of Saudi Arabia*, 565 F. Supp. 2d 59, 61-62 (D.D.C. 2008) (citations omitted). "Following the execution of the [Letter of Acceptance], the United States procures defense articles and services directly from a defense contractor. The United States Government then sells these articles and services to the foreign government. Thus, for defense articles procured under the FMS Program, there are

contractual relationships between the United States and the foreign government and between the United States and the defense contractor." *Id.*

FMS sales allow the United States to sell defense articles and services to foreign allied governments, in furtherance of the federal government's national security interests. *Id*. Indeed, under the Arms Export Control Act, the United States Government may not make an FMS sale to a foreign country unless "the President finds that the furnishing of defense articles and defense services to such country . . . *will strengthen the security of the United States* and promote world peace." *See* 22 U.S.C. § 2753(a)(1) (emphasis added).

### B. Raytheon Enters Into A Subcontract With Northrop To Provide RWR Components For The F-16 Fleet The Hellenic Ministry of National Defense Purchased Under The Peace Xenia III FMS Program.

To execute the ASPIS II Program, Raytheon entered into a firm, fixed-price $74 million contract with Northrop dated September 23, 2003 (the "Subcontract"). (Compl. ¶¶ 6, 8, Ex. A.)  Under the Subcontract, Northrop is obligated to provide the RWR components of the electronic warfare suites.  The Subcontract's Statement of Work (*see* Horowitz Decl. Ex. A), lays out the scope of Northrop's contractual obligations.  Among other things, Northrop is obligated to:

- "Design and develop, fabricate, test, qualify, deliver, and support [the RWR systems and services] per the requirements of the Subcontract and this [Statement of Work]"; and
- "Integrate, test and verify performance of the ASPIS II [electronic warfare suite] per the requirements of the Subcontract and this [Statement of Work]."

Northrop must also support Acceptance Flight Test ("AFT") in accordance with the Statement of Work.  (*See id.* at ¶¶ 3.8.2.2– 3.8.2.3.)  This support requires Northrop to, among other things, "[e]vaulate/analyze [Greek Air Force] provided AFT Threat and Countermeasures Data," provide "[o]n-site technical personnel to assist in

3

conducting [Raytheon's] Evaluation Flights," and provide "[s]pecialized RWR maintenance and reprogramming test equipment-spares, and engineering and test equipment 'as required' . . . ." (*Id.*)

Because Northrop's participation in these various acceptance tests is crucial to Raytheon's performance under the ASPIS II Prime Contract, the Subcontract makes "successful completion" of these tests a condition precedent to payment. For example, the Subcontract provides that Northrop is to be paid $11,100,000 upon successful completion of First Article Acceptance Test, and $3,700,000, plus an additional 50 percent the balance of the Hardware Items delivered, upon successful completion of AFT. (Compl. Ex. A at 23–24.)

### C. Raytheon Enters Into A Prime Contract With The United States Government To Provide Electronic Warfare Suites For A New F-16 Fleet For Greece, And Thereafter Subcontracts With Northrop.

After the ASPIS II Program began, the Hellenic Ministry of National Defense decided to further enhance its aircraft fleet and, pursuant to a Letter of Acceptance with the United States Government, ordered new F-16s under a FMS program dubbed Peace Xenia IV.[1] To fulfill this Letter of Acceptance, the United States Government entered into a prime contract with Lockheed to provide the F-16 aircraft. (*See* Horowitz Decl. Ex. C at ¶ 1.0 ("Lockheed through a separate contract with USAF/F-16 SG, will perform the function of the overall aircraft system integrator").) And, so these F-16s could be equipped with the same state-of-the-art technology with which the Hellenic Ministry of National Defense was retrofitting its current fleet, the United States Government also entered into a prime contract with Raytheon to provide the same electronic warfare suites it was providing under the ASPIS II Prime Contract for

---

[1] It is no answer for Northrop to say that this background is outside the Complaint—both because a plaintiff cannot use artful pleading to avoid federal jurisdiction (*see Brennan v. Southwest Airlines Co.*, 134 F.3d 1405, 1409 (9th Cir. 1998)), and because none of this background can seriously be disputed when Northrop's own pleadings allude to it. (*See, e.g.,* Pl.'s Mot. 2, 5.) Even on its own terms, Northrop's argument does not support remand. At best, Northrop's contentions would warrant jurisdictional discovery before this motion is decided.

4

the F-16s. (Horowitz Decl. Ex. B.[2]) Indeed, the Peace Xenia IV Prime Contract's Statement of Work provides that "[t]his purchase shall be a follow-on order for the ASPIS II ship-sets being procured under DCS Contract 015C/03 [the ASPIS II Prime Contract]," and that "[t]he three subsystems [to be provided] are the same LRU part numbers for the ASPIS II produced for the [Greek Air Force] . . . under [the ASPIS II Prime Contract]." (Horowitz Decl. Ex. C at ¶¶ 1.0, 3.1.1.) Raytheon, in turn, subcontracted with Northrop to provide the same RWR equipment it was providing under the Subcontract.[3] (O'Brien Decl. Ex. 1.)

Because Raytheon and Northrop would be developing, testing, and delivering the same equipment under both the Peace Xenia IV and ASPIS II series of contracts, the Peace Xenia IV Prime Contract requires that the "the ASPIS II suite shall be in compliance to the Technical Specifications established under the [ASPIS II Prime Contract]." (Horowitz Decl. Ex. C at ¶ 3.1.3.) And because the testing required to ensure compliance with these technical specifications was already laid out in detail in the ASPIS II series of contracts, the Peace Xenia IV Prime Contract specifically relies on performance of this testing, including AFT, under the ASPIS II series of contracts.

AFT is not merely an acceptance test. Rather, it is critically important to the successful completion of both the ASPIS II and Peace Xenia IV programs. Indeed, Annex "L" to the Subcontract, which sets out the AFT procedure, confirms that "[t]he objective of the AFT is to evaluate the compliance of the 'ASPIS II' suite performance with the 'ASPIS II Technical Specification' . . . ." (Horowitz Decl. Ex. D at ¶ 1.1.) Accordingly, both the ASPIS II Prime Contract and Peace Xenia IV Prime Contract depend on AFT to, among other things, refine and correct any

---

[2] This contract is called the "ASPIS II for the [Greek Air Force] F-16 Peace Xenia IV Block 52+ Program," but is referred to herein as the "Peace Xenia IV Prime Contract."

[3] To be sure, Raytheon's subcontract under the FMS program is with a different affiliate (Northrop Grumman Systems Corporation) of Northrop Grumman. But as described below, this corporate formality is irrelevant to the jurisdictional analysis.

hardware and software anomalies discovered during AFT, and retrofit the hardware to address any such issues.

Recognizing that these hardware and software changes will occur under the ASPIS II series of contracts, the Peace Xenia IV Prime Contract includes a "concurrency clause" setting a cap on the amount Raytheon may claim for the changes through AFT certification. (Horowitz Decl. Ex. B, ¶ H-900.) Finally, to document the interrelatedness of the ASPIS II and Peace Xenia IV programs, the Hellenic Ministry of National Defense and Raytheon amended the ASPIS II Prime Contract referenced in the Complaint to provide that "[a]ll parts. . . to be used in the manufacturing of the Contractual Items shall be new, recently manufactured and unused, with the exception, however, of the hours of operation required for the Acceptance Test and any other activity required by this Contract *and the Peace Xenia IV Program*." (Horowitz Decl. Ex. E at ¶ 7.3; as amended by Ex. F at ¶ 4(d).)

### D. Northrop's Delays Prevent Raytheon From Reaching AFT And Rather Than Work Cooperatively With Raytheon, Northrop Seeks To Have Its Performance Obligations "Excused."

Before even reaching AFT, Northrop was first obligated to timely deliver compliant "Hardware Items" to Raytheon which Raytheon, in turn, would deliver to the Greek Air Force. That did not happen. Indeed, Northrop concedes that the "Subcontract program schedule experienced delays due to various causes," (Compl. ¶12), but omits to mention that those "various causes" were attributable to Northrop.

Because Raytheon does not get paid under the ASPIS II Prime Contract unless and until AFT is successfully completed, it has every incentive to move the ASPIS II Program forward to AFT. But although Northrop's participation is necessary to reaching that milestone, it now asks Raytheon to go it alone. In no uncertain terms, Northrop contends that its "further performance of AFT" is "excused." (*See* Compl. ¶ 25.) In sharp contrast to the position asserted in Northrop's brief, Northrop's Complaint *does not* allege that it must still support AFT in accordance with the

1 | Subcontract's Statement of Work, or fulfill its other contractual obligations
2 | notwithstanding this "excuse."

3 |     Northrop's refusal to perform its contractual obligations has repercussions
4 | extending beyond the ASPIS II Program. Indeed, even Northrop does not dispute that
5 | all of the development and testing of electronic warfare suites and RWR equipment to
6 | be provided under the Peace Xenia IV FMS Program, including AFT, must take place
7 | under the ASPIS II Program. Nor does Northrop dispute that the federal government
8 | depends on AFT to fulfill its international obligations to Greece under a Letter of
9 | Acceptance requiring the United States Government to provide F-16s *with* ASPIS II
10 | equipment, or that the Peace Xenia IV Program has been effectively on hold pending
11 | AFT under ASPIS II. Finally, Northrop does not dispute that the Peace Xenia IV and
12 | ASPIS II programs further the United States' national security interests.

### III. ARGUMENT

Against this backdrop, Northrop's remand motion fails under controlling Ninth Circuit precedent. As the Ninth Circuit explained in *New SD, Inc. v. Rockwell Int'l Corp.*, a dispute between military contractors strongly supports the exercise of federal question jurisdiction where, as here, the dispute implicates the national security interests of the United States. 79 F.3d 953, 954–55 (9th Cir. 1996). None of Northrop's arguments support remand.

#### A. Northrop's Remand Motion Should Be Denied Because This Court Has Federal Question Jurisdiction Over Northrop's Claims.

Northrop argues that the Court should remand this case because Northrop has captioned its claims as state-law claims, and "the well-pleaded complaint rule bars Raytheon from claiming federal question jurisdiction based on Peace Xenia IV." (Pl.'s Mot. 12–13.) But in *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507–08, 108 S. Ct. 2510, 101 L. Ed. 2d 442 (1988), the Supreme Court held that federal common law applies to a dispute where: (1) the case involves "an area of uniquely federal interest"; and (2) there exists a "significant conflict . . . between an identifiable

7

federal policy interest and the operation of state law." *Id.* This case satisfies both *Boyle* prongs.

### 1. Northrop's Claims Implicate The Government's Unique National Security Interests.

This Court has subject matter jurisdiction over this action because it is a dispute between two parties to a subcontract directly concerned with the United States' national security interest. *See New SD*, 79 F.3d at 954–55 (holding that federal common law applies to dispute between subcontractor and prime contractor implicating national security); *Am. Pipe & Steel Corp. v. Firestone Tire & Rubber Co.*, 292 F.2d 640, 643–44 (9th Cir. 1961). To be sure, the subcontract Northrop sues on is directly subordinate to the ASPIS II Prime Contract, not the Peace Xenia IV Prime Contract. But that distinction makes no difference. Northrop's claims affect vital government national security interests all the same. Indeed, the federal government has a direct interest in the outcome of this case because Northrop's (and Raytheon's) successful performance under the ASPIS II series of contracts is necessary for the United States Government to succeed under the Peace Xenia IV series of contracts. If Northrop's performance is excused, Raytheon will not be able to fulfill its obligations to the Hellenic Ministry of National Defense, much less its obligations to the federal government under the Peace Xenia IV Contract. The federal government, in turn, will not be able to fulfill its obligations under a Letter of Acceptance to Greece, a NATO ally.[4]

Given these vital national security interests, Northrop's characterization of its claims as "state law" claims is irrelevant to the jurisdictional analysis. It is likewise irrelevant that the Subcontract contains a California choice of law clause. Even where state law creates the cause of action, a claim nonetheless "arise[s] under" federal law

---

[4] For this same reason, Northrop's corporate formalities argument misses the mark. Even if a different Northrop Grumman subsidiary is a signatory to the Peace Xenia IV prime contract, Northrop's performance under the Subcontract still affects national security.

8

1  where the right to relief affects significant federal interests, including national security
2  interests.  *See Boyle*, 487 U.S. at 504–07.
3        In *American Pipe*, for example, the Ninth Circuit held that federal common law
4  applied in a diversity case (where state law would ordinarily apply) because plaintiff's
5  claims directly impacted a government prime contract connected with national
6  security.  *American Pipe*, 292 F.2d at 643–44.  Similarly, in *New SD*, the Ninth Circuit
7  affirmed the district court's decision applying federal law to a subcontractor's breach
8  of contract claim because the dispute impacted the performance of a government
9  contract.  *New SD*, 79 F.3d at 955.  These cases are not confined to the circuit level.
10 *See Grinnell Fire Prot. Sys. Co. Inc. v. Regents of the Univ. of Cal.*, 554 F. Supp. 495,
11 498 (N.D. Cal. 1982) (applying federal law to subcontract that implicated national
12 defense and security).
13       As in *New SD*, the nexus between the Subcontract and the United States
14 Government's national security interest is undeniable.  Accordingly, the first prong of
15 *Boyle* is satisfied here.

16      2.  <u>Raytheon Need Not Demonstrate A Specific Conflict Between State And Federal Law Because The Government's National Security Interest Provides The Requisite Conflict.</u>

18       Northrop argues that Raytheon must demonstrate why state law, including
19 Article 2 of the Uniform Commercial Code, differs from federal common law on the
20 issues raised in the Complaint to justify federal question jurisdiction.  (Pl.'s Mot.
21 16:16–22.)  But Northrop's position wholly ignores *New SD*.  There, the Ninth Circuit
22 did not find it necessary to analyze whether the end result on certain issues would be
23 different under state law or federal government contract law.  Instead, where, as here,
24 a significant federal national security interest "requires that the rule . . . be uniform
25 through the country," then the "*entire body of state law applicable to the area*
26 *conflicts and is replaced by federal rules*."  *See New SD*, 79 F.3d at 955 (internal
27 quotations omitted) (emphasis added).  Because federal common law supplants state
28

9
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND FOR
LACK OF SUBJECT MATTER JURISDICTION

law to the extent that Northrop's claims implicate unique federal interests, this Court need not engage in an additional conflicts analysis. *See id.*

Moreover, Raytheon's proposed conflict is not based on a "key faulty premise." (Pl.'s Mot. 17:15.) The Subcontract sets out an explicit payment scheme requiring AFT to occur *before* Raytheon gets paid by the Hellenic Ministry of National Defense, and before Northrop gets paid by Raytheon. (Compl., Ex. A at 23–24.) This condition precedent to payment incentivizes Northrop to perform the significant services it is required to perform under the Subcontract and Statement of Work.

While Northrop now contends that it is still willing to perform its contractual obligations, including AFT, but just wants to get paid first, its Complaint says something entirely different—that its performance of AFT should be excused. But even if Northrop could retreat from its allegations, altering this agreed-upon payment structure would still impose significant obstacles to the successful completion of AFT by removing the incentive structure the parties bargained for.

### B. Northrop's Reliance On Out-of-Circuit Case Law Is Misplaced.

Faced with binding authority undermining its remand motion, Northrop invites the Court to ignore *New SD* and *American Pipe* in favor of Seventh and Second Circuit authority. The Court should reject this invitation. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (holding that Ninth Circuit authority binds Ninth Circuit courts absent "clearly irreconcilable" intervening Supreme Court or Ninth Circuit *en banc* authority).

In any event, Northrop's out-of-circuit authority is off-base. Northrop contends that this "case is akin to *Northrop Corp. v. AIL Sys., Inc.*, 959 F.2d 1424 (7th Cir. 1992)." It is not. *Northrop Corp.* concerned a "teaming agreement" (i.e., an agreement between two contractors to bid on a government contract). *Id.* But a teaming agreement is merely an agreement between companies who hope to *pursue* government business that they may or may not obtain, and thus at best is a *precursor* to the actual award of a government contract and related subcontracts. *Id.*

("Subcontracts are agreements to perform work on government projects; teaming agreements are arrangements which *may* give rise to such subcontracts.") (emphasis in original). Here, there is an actual subcontract directly affecting a federal government project.

*Woodward Governor Co. v. Curtiss-Wright Flight Sys., Inc.*, 164 F.3d 123, 128 (2d Cir. 1999) is also distinguishable. That case concerned a breach of contract action by a *sub*-subcontractor for the provision of "test stands" for bay doors on F-22s. *Id.* The *Woodward* court found *New SD*'s analysis "unhelpful" because those test-stands did not become part of the F-22s, but instead were used only to help the subcontractor perfect the bay doors. *Id.* at 128. Thus, the *Woodward* case was much further removed from national security interests than Northrop's claims here. The components that Northrop claims it should be excused from testing are an integral part of a sophisticated threat-detection system placed directly in F-16 aircraft—where, as explained above, the alteration of those performance obligations would impact the ability to fulfill commitments that the federal government has made to a foreign ally.

### C. Northrop's Reliance On Raytheon's Complex Case Designation Request Is A Red Herring.

Rule 3.402(b) of the California Rules of Court provides that a defendant must file and serve a complex case counterdesignation "no later than its first appearance." Lest Raytheon's filing of a Notice of Removal of Civil Action with the Los Angeles Superior Court be construed as an "appearance" for purposes of Rule 3.402(b), Raytheon filed a complex case counterdesignation out of an abundance of caution. In that request, Raytheon stated that it "believes that this matter belongs in District Court," but "in the event that the District Court remands the case" requests a complex designation because the case would likely involve "expansive discovery and a large amount of documentary evidence." (O'Brien Decl. Ex. 2 at 1:4–5, 2:3–4.) Moreover, given Northrop's allegations that Raytheon was "in forfeiture of its prime contract," Raytheon made the unremarkable observation that the case "*may* concern novel legal

11

issues, including the interpretation of Hellenic law." (*Id*. at 1:23–24 (emphasis in original).)

Citing Raytheon's Request for Complex Case Designation, Northrop now argues that factual "complexity," and the "issue of Hellenic law" compel against federal question jurisdiction. (Pl.'s Mot. 15:1-28.) Not true. First, Northrop cites no case holding that courts should, or can, determine the existence of federal question jurisdiction based on the scope of potential discovery and amount of documentary evidence that might be at issue in the litigation. Second, Raytheon did not, as Northrop contends, assert that Hellenic law necessarily applies to this dispute—its complex case designation merely set forth the potential considerations relevant to the complex-case-transfer analysis. Moreover, that the ASPIS II Prime Contract is governed by Hellenic law does not make uniformity "impossible." (Pl.'s Mot. 15:16.) Federal common law can apply here, regardless of whether Raytheon ultimately has a separate dispute with the Hellenic Ministry of National Defense requiring the application of Hellenic law. And if resolving a particular issue arising in the litigation could be aided by reference to Hellenic law, a federal court applying federal law could consult Hellenic law for guidance. *Cf. Golden Trade v. Lee Apparel Co.*, 143 F.R.D. 514, 521 (S.D.N.Y. 1992) (consulting the laws of Norway, Germany, and Israel to determine the scope of the attorney-client privilege under federal law).

### D. Northrop's Fee Request Should Be Denied Because Clear Ninth Circuit Authority Provides An Objectively Reasonable Basis For Removal.

As detailed above, this case fits squarely within the *New SD* and *American Pipe* paradigm. It concerns a claim by a subcontractor implicating directly the rights and obligations of the federal government and matters of national security.

Even so, Northrop seeks fees, and claims that Raytheon's removal was "for reasons clearly designed to delay this case." (Pl.'s Mot. 19:27–28.) As evidence of this purported "delay," Northrop cites the fact that it served Raytheon with discovery "[p]rior to removal." (*Id*. 19:28–20:3.) But Northrop fails to disclose that it rushed to

12

1  serve discovery *the day before* Raytheon removed, only *after* Raytheon's counsel had
2  informed Northrop's counsel as a courtesy of Raytheon's intent to file a notice of
3  removal.  (*See* Horowitz Decl. ¶¶ 1–2.)  The Court should see through this attempt to
4  manufacture a delay argument.
5      In any event, Northrop's request for attorneys' fees must be denied for the
6  straightforward reason that under 28 U.S.C. § 1447(c), "attorney's fees should not be
7  awarded when the removing party has an objectively reasonable basis for removal."
8  *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005).  Even if *New SD* and
9  *American Pipe* are, as Northrop contends, "easily distinguished"—and they are not—
10 Raytheon's position is not "wrong as a matter of law."  *Cf. Balcorta v. Twentieth
11 Century-Fox Film Corp.*, 208 F.3d 1102, 1106 n.6 (9th Cir. 2000).  Northrop cites no
12 binding authority affirmatively precluding federal question jurisdiction on these facts.

## IV.  CONCLUSION

For the foregoing reasons, and as set forth in the Notice of Removal, the Court should deny Northrop's motion to remand, as well as its request for attorneys' fees.

DATED:  July 19, 2010                        KIRKLAND & ELLIS LLP


       /s/ Mark Holscher
Mark Holscher
Attorney for Defendant Raytheon Company

13

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND FOR
LACK OF SUBJECT MATTER JURISDICTION